**F I L E D**

**PUBLISH**

**AUG 15 2000**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

DANIEL HARRIS SICKEN;
OLIVER SACHIO COE, also known
as Oliver Hydon,

      Defendants - Appellees.

No. 99-1166

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 98-CR-339-WM)**

_____

Sean Connelly, Assistant U.S. Attorney (Thomas L. Strickland, United States
Attorney, and Bernard E. Hobson, Assistant U.S. Attorney, with him on the brief),
Denver, Colorado, for Plaintiff-Appellant.

Scott Poland of Poland & Wheeler, Lakewood, Colorado, and Richard N. Stuckey,
Denver, Colorado, for Defendants-Appellees.

_____

Before **BRORBY**, **McKAY**, and **BRISCOE**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

The United States appeals the district court's four-level downward departure in sentencing two anti-nuclear protestors who broke into and damaged a secured intercontinental ballistic missile site. Pursuant to 18 U.S.C. § 3742(b), the government challenges the ability of the district court to depart downward. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

## I.

Defendants Daniel Harris Sicken and Oliver Sachio Coe are anti-nuclear protesters and members of an organization called the Plowshares Movement. On August 6, 1998, they broke into an unmanned nuclear missile facility in Weld County, Colorado, by cutting barbed wire and scaling a fence. Operated by the United States Air Force, the facility contained a Minuteman III intercontinental ballistic missile capable of being armed with three separate nuclear warheads. At trial, Defendants stated that their purpose in breaking into the site was to perform an anti-nuclear protest by "disarm[ing] nonviolently and symbolically." R., Vol. 4 at 416. Once on the grounds of the facility, Defendants used sledgehammers and chisels to damage components of the site, including an electrical junction box, the concrete blast door to the underground missile silo, and the rails on which the blast door moved. They also poured water into a circuit and a security pit, hung banners, and used spray paint mixed with blood to paint slogans and

designs on site components. After committing these acts, Defendants waited on the site for military authorities to arrive and arrest them. Their actions caused approximately $21,000 in damages, and repairs were estimated to take about 410 work hours.

On October 8, 1998, Defendants were charged with three counts in a superseding indictment: (1) conspiracy to injure, destroy, and contaminate national defense materials and premises of the United States with intent to injure, interfere with, and obstruct the national defense of the United States in violation of 18 U.S.C. § 2155; (2) willful and unlawful destruction of national defense materials and premises in violation of 18 U.S.C. § 2155(a), otherwise known as sabotage; and (3) willful and unlawful destruction of United States property in violation of 18 U.S.C. § 1361. Defendants were tried by a jury and convicted on all counts.

In sentencing Defendants, the district court adopted the findings and recommendations of the presentence report. Section 2M2.3 of the United States Sentencing Guidelines sets the base offense level at twenty-six for counts one and two. The applicable guideline for count three is U.S.S.G. § 2B1.3, which sets the offense level at four. Because the three counts were closely related, i.e., they involved substantially the same harm, victim, and act, they were grouped together under § 3D1.2(a). According to § 3D1.3(a), the highest offense level (twenty-six

under § 2M2.3(a)) applied. The court then reduced Defendants' base offense levels by three levels to twenty-three for Defendants' acceptance of responsibility under § 3E1.1. See R., Vol. 6 at 15. Consequently, Mr. Sicken had an offense level of twenty-three and a criminal history category III, resulting in a sentencing range from fifty-seven to seventy-one months. See id., Vol. 1, Doc. 85 at 7; Vol. 6 at 16. Mr. Coe also had an offense level of twenty-three, but his criminal history category was I, which resulted in a sentencing range from forty-six to fifty-seven months. See id., Vol. 1, Doc. 84 at 7; Vol. 6 at 15.

The district court rejected Defendants' arguments for sentencing under the property damage charge, 18 U.S.C. § 1361, rather than the sabotage charge, and for downward departures based on the lesser harm guideline, U.S.S.G. § 5K2.11, and the "coercion and duress" guideline, § 5K2.12. See R., Vol. 6 at 34-38. However, the court asked the parties to brief whether a departure under U.S.S.G. § 5K2.0 was proper where aggravating or mitigating circumstances are not adequately considered by the applicable guideline, § 2M2.3. The court was concerned with the fact that § 2M2.3 did not recognize differences in conduct and thus did not provide any adjustments based on the severity of offense conduct. See id. at 39 (stating that destroying an "enormous bomber" or merely painting or damaging the surface of "some facility connected with defense" would be treated the same).

After reviewing the materials submitted by the parties, including the only case where civilian anti-nuclear protesters were sentenced under 18 U.S.C. § 2155, United States v. Kabat, 797 F.2d 580 (8th Cir. 1986), and a 1997 proposed but unadopted amendment to U.S.S.G. § 2M2.3 in which upward and downward departures for sabotage were discussed, see Sentencing Guidelines of the United States Courts, 62 Fed. Reg. 152, 196 (1997) (proposed Jan. 2, 1997), the court concluded that this situation warranted a departure from the offense level dictated by § 2M2.3.

Specifically, the court stated at the sentencing hearing that if Kabat "somehow indicates our heartland, it suggests at least that maybe the heartland doesn't necessarily include one sentence." R., Vol. 6 at 40. By this, it appears that the court was impressed by the gradations in sentences imposed in Kabat. The court's decision to depart also was influenced by the fact that the Guidelines as a whole include "all kinds of gradations" for the severity of offense conduct. Id. And finally, the court considered the Sentencing Commission's proposed 1997 amendment to § 2M2.3. Rejecting the government's argument that the Sentencing Commission did not adopt the proposed amendment because it intended to prevent any gradation or variance in sentences, the court reasoned that "as a matter of general principle . . . the failure to pass some law doesn't mean it's been rejected." Id. at 42.

The court then determined that, applying Koon v. United States, 518 U.S.

81 (1996), departure was neither forbidden nor encouraged. See R., Vol. 6 at 42.

It reviewed the factors articulated in the proposed amendment that might support

or negate a departure, stating that there is a clear difference between "an act of

protest, which this clearly was, in peacetime as opposed to an act of sabotage

during war," id. at 43; that the acts caused some harm but there was no substantial

risk of death or injury, see id. at 44; and that there was no "truly significant or

substantial" risk to national security. Id. For these reasons, the court granted a

four-level downward departure under § 5K2.0.

In the judgments entered on March 5 and 9, 1999, the court restated its

reasons for departing downward:

> Pursuant to U.S.S.G. § 5K2.0, there are mitigating circumstances not
> adequately taken into consideration under [the] Guidelines.
>
> 1) There is no real historical record to determine the "heartland" of
> these cases.
>
> 2) [There are no] Offense Severity Gradations in U.S.S.G. § 2M2.3.
> [The court] [n]eed[s] to be able to distinguish between the little or no
> harm to national security caused by a peace-time protest and the harm
> caused by a major destructive act in wartime.

Id., Vol. 1, Doc. 85 at 7; see id., Doc. 84 at 7. The departure resulted in an

offense level of nineteen for each defendant, which reduced their sentence ranges

by sixteen months. The district court imposed concurrent sentences of forty-one

months on Defendant Sicken for each of the three counts, and it imposed

-6-

concurrent sentences of thirty months for Defendant Coe for the same counts. The court also sentenced each defendant to three years' supervised release and ordered each to pay restitution in the amount of $21,299.40.

In challenging the district court's departure under § 5K2.0, the government makes several arguments. We address each of these arguments in turn.

## II.

The Sentencing Guidelines provide that each guideline carves out a "heartland," "a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. ch. 1, pt. A, subpt. 4(b). The Guidelines explain that "[w]hen a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." Id. As a result, a sentencing court may depart from the Guidelines and impose a sentence outside the guideline range where it "finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" Id. § 5K2.0 (quoting 18 U.S.C. § 3553(b)).

We review a sentencing court's decision to depart under a unitary abuse-of-discretion standard which "includes review to determine that the

discretion [of the district court] was not guided by erroneous legal conclusions."

See Koon v. United States, 518 U.S. 81, 100 (1996); United States v. Collins, 122 F.3d 1297, 1302 (10th Cir. 1997).  According to the Supreme Court, in promulgating the Guidelines, "Congress did not intend . . . to vest in appellate courts wide-ranging authority over district court sentencing decisions."  Koon, 518 U.S. at 97.  "Rather, Congress meant to 'establish[ ] limited appellate review' where 'district courts retain much of their traditional sentencing discretion.'"  Collins, 122 F.3d at 1302 (quoting Koon, 518 U.S. at 97).  However, the Court stated that "[t]he deference that is due depends on the nature of the question presented."  Koon, 518 U.S. at 98.

With this statement in mind, this court articulated four inquiries appellate courts must make in determining whether the district court abused its discretion in departing from the Guidelines.  See Collins, 122 F.3d at 1302-03.  They are:

> (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure, (3) whether the record sufficiently supports the factual basis underlying the departure, and (4) whether the degree of departure is reasonable.

Id. at 1303.[1]

The first inquiry–whether the factual circumstances supporting departure

---

[1]Only the first and second inquiries are at issue in this case.

are permissible departure factors–is a legal one to which an appellate court owes no deference. See Koon, 518 U.S. at 100; United States v. Rivera, 994 F.2d 942, 951 (1st Cir. 1993). In addition, we explained in Collins that where a district court's decision to depart involves its determination as to what constitutes a guideline's heartland, appellate review would not be deferential because the question of what constitutes a guideline's heartland is essentially legal in nature. See Collins, 122 F.3d at 1303 n.4 (citing Rivera, 994 F.2d at 951, for the discussion of "the 'quintessentially legal' question of what constitutes the heartland of the child pornography guideline"). However, an appellate court owes "'substantial deference' to the district court's resolution of the second question, whether 'a particular [defendant] is within the heartland given all the facts of the case.'" Id. at 1303 (citation omitted). This type of essentially factual question "amount[s] to a judgment about whether the given circumstances, as seen from the district court's unique vantage point, are usual or unusual, ordinary or not ordinary, and to what extent." Rivera, 994 F.2d at 951; accord Collins, 122 F.3d at 1303; see also Koon, 518 U.S. at 98 (instructing that a "district court must make a refined assessment of the many facts bearing on the outcome, informed by its [unique] vantage point and day-to-day experience in criminal sentencing").

## III.

## A. The Heartland

Within this framework, the first step in deciding whether a departure is appropriate is to determine the "heartland" of a particular guideline, i.e., the conduct embodied by "a set of typical cases" under § 2M2.3. U.S.S.G. ch. 1, pt. A, subpt. 4(b). The problem facing the district court in this case was that there is no "set of typical" sabotage cases. The government asserts that the district court was unable to identify a heartland and that its failure to do so prevents a departure. This issue is one of first impression in this court.

While we agree that a court must determine what the heartland is so that it may then ascertain whether the instant case is unusual enough to fall outside that heartland, we are not persuaded by the government's argument that the court here failed in this regard with respect to § 2M2.3. The district court stated that there was "no real historical record to determine the 'heartland' of these cases," R., Vol. 1, Doc. 84 at 7; Doc. 85 at 7, and that "there really just isn't an ability to find out" the heartland history. Id., Vol. 6 at 39. By these statements we do not think that the court meant that there was no heartland for convictions sentenced under § 2M2.3. Rather, the court recognized that there were no cases which have in any way defined the heartland for § 2M2.3 and would thereby assist the court in determining whether a departure was appropriate.

It is indisputable that there is no body of case law involving sentences for

civilian sabotage under 18 U.S.C. § 2155 and U.S.S.G. § 2M2.3. In fact, there was very little from which the court in this case could determine a heartland. According to the parties and our own research, there is only one reported case involving a successful civilian prosecution for sabotage under § 2155, the Eighth Circuit's pre-Guidelines decision in Kabat, 797 F.2d 580.

Nonetheless, the government appears to concede and we agree that every sentencing guideline has a heartland. In other words, the Sentencing Commission contemplated that there are or will be cases circumscribed by certain facts which represent the typical case that each guideline was intended to address. Defining a heartland, therefore, must begin somewhere, whether by cases that fit within the heartland or cases that are outside of it. To argue that the first case addressing a matter cannot, as a matter of law, be outside the heartland is contrary to both logic and to the mandate of the Guidelines which Koon made clear: District courts have the most important function in sentencing because they have the responsibility of determining in the first instance the factual circumstances that define a particular guideline heartland. See generally Koon, 518 U.S. at 97-99. We do not read the Guidelines to limit a sentencing court's analysis of a particular case before it by preventing it from determining a heartland for the first case addressing a particular guideline. Certainly, where no other cases representing a heartland exist, the heartland at least can be partly defined by a

case that a court determines is atypical.

Because there is no body of law that defines the heartland of § 2M2.3, the district court examined the language of the guideline itself, the language of § 2155, the decision in Kabat, and the Sentencing Commission's proposed amendment to § 2M2.3, assessing the type of conduct that would represent the heartland. It is clear from the context of the court's entire discussion on departure that the district court identified, perhaps implicitly, a heartland by concluding that the guideline's stated offense level covered situations presenting significant harm or risk of harm to national defense. Considering the record as a whole and given the dearth of case law interpreting § 2155 and § 2M2.3 in these circumstances, we cannot say that this is an erroneous determination of § 2M2.3's heartland.

### B. **Kabat**

In the alternative, the government contends that there was no legal basis for the departure because Defendants' conduct "[fell] squarely within the heartland of the sabotage statute and guideline." Appellant's Br. at 8. Without making any attempt to define the heartland, the government argues that this case is within the heartland because it is so similar to Kabat and Kabat was the only § 2155 case in existence at the time the Sentencing Commission adopted § 2M2.3.

-12-

This case is strikingly similar to Kabat. The defendants in Kabat, like those in this case, broke through a perimeter fence and used a jackhammer to cause $29,000 in damages to various components at a missile site. They also hung banners and waited for authorities to arrest them. Despite the factual similarities between Kabat and this case, the government presents no evidence that the Sentencing Commission considered Kabat in adopting § 2M2.3 or established its offense level to somehow reflect the sentences in that case. To the contrary, we think that the range of sentences imposed in Kabat for the sabotage and destruction of property charges clouds any relationship between Kabat and § 2M2.3.[2] In addition, there was no challenge in Kabat to the sentences imposed by the district court in that case; the underlying issues concerned the element of intent to injure national defense and jury instructions. See id. at 584. We are not persuaded by the government's argument that Kabat necessarily describes the heartland of § 2M2.3. If any inference at all is to be drawn from Kabat, we think the only reasonable one is that gradations in sentences according to severity of conduct are permissible.

---

[2]For the sabotage and destruction of property counts, the district court in Kabat imposed consecutive sentences ranging from four years to nine years. See Kabat, 797 F.2d at 583-84 & n.3.

The Guidelines provide that the minimum sentencing range for a sentence under § 2M2.3 with a base offense level of 26 and a criminal history category I is 63-78 months (5.25-6.5 years). See U.S.S.G. ch. 5, pt. A (Sentencing Table).

## C. Grounds for Departure

Finally, the government contends that the district court relied on several impermissible factors for its departure under § 5K2.0. Though the Guidelines do not "'limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case,'" Koon, 518 U.S. at 93 (quoting U.S.S.G. ch. 1 pt. A, intro. comment. 4(b)), they list factors that are encouraged and discouraged as bases for departure.[3] The Guidelines also instruct that "[i]mpermissible factors include forbidden factors, discouraged factors that are not present to some exceptional degree, and encouraged factors already taken into account by the applicable guideline that are not present to some exceptional degree." Collins, 122 F.3d at 1303. If an appellate court determines that a district court based a departure on both valid and invalid factors, the court should remand the case "unless it determines the district court would have imposed the same sentence absent reliance on the invalid factors." Koon, 518 U.S. at 113.

**1.**

---

[3]The Guidelines list several factors that cannot be bases for departure, including race, sex, national origin, creed, religion, and socioeconomic status, see U.S.S.G. § 5H1.10; lack of guidance as a youth, see § 5H1.12; drug or alcohol dependence, see § 5H1.4; and economic duress, see § 5K2.12.

The government first argues that the lack of offense severity gradations in § 2M2.3 is not a proper ground for departure. It complains that "[t]he court's departure seemingly reflected a personal judgment that the guideline range for these offenses was too harsh" and that it had no authority to depart merely because it disagreed with the Guidelines. Appellant's Br. at 12.

While it may be difficult at times to determine whether a sentencing court is impermissibly disagreeing with a guideline or permissibly finding a case atypical, we conclude that, in this case, the court's departure was based on the latter. In permissibly finding this case atypical, the court reviewed "the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b). Because these sources are silent on the range of conduct covered by the guideline, it was apparent to the court that the seriousness of the offense was a circumstance not adequately taken into consideration by the Sentencing Commission.

In addition, the court addressed the Sentencing Commission's acknowledgment in its proposed amendment that "the statutes referenced to §§ 2M2.1 and 2M2.3 cover an extremely wide range of conduct," 62 Fed. Reg. at 196, and that a departure may be warranted depending on the seriousness of the offense in question. According to the application note in the proposed amendment, a departure may be warranted because "it is not possible to include

all of the potentially relevant circumstances in the offense level." Id. "For example, if the defendant was convicted under 18 U.S.C. § 2155 of throwing paint on defense equipment or supplies as an act of protest during peacetime, the offense level in subsection (a)(2) [twenty-six, as currently mandated under § 2M2.3,] may overrepresent the seriousness of the offense." Id.

Reliance on the commentary and text of the proposed amendment was not improper because it is unlike the situation where an amendment proposed by the Sentencing Commission is clearly rejected by Congress. In that situation, reliance on the rejected proposal would be improper. See United States v. Gaines, 122 F.3d 324, 329-30 (6th Cir. 1997); cf. United States v. Morelli, 169 F.3d 798, 809 n.13 (3d Cir.) (observing that proposed amendments to Sentencing Guidelines do not provide independent legal authority for a downward departure), cert. denied, __ U.S. __ , 120 S. Ct. 63 (1999). In fact, though we do not know why the proposed amendment was not enacted, the only evidence suggests that the Sentencing Commission was just too busy with other matters to deal with it. According to the Federal Register, this particular guideline amendment, along with many others, was characterized as a proposed non-emergency amendment. See 62 Fed. Reg. at 152, 160.

It is significant that the district court here followed the mandate of 18 U.S.C. § 3553(a)(2)(A) by giving weight to the central purpose in sentencing, that

is "for the sentence imposed . . . to reflect the seriousness of the offense."  As

noted by the court, the Guidelines routinely involve other situations where the

seriousness of offense conduct is a valid reason to depart.  See, e.g., United States

v. Sanchez-Rodriguez, 161 F.3d 556, 561 (9th Cir. 1998) (en banc) (affirming

downward departure in sentencing for illegal reentry following aggravated felony

based on minimal amount of drugs involved in underlying felony); United States

v. Stockheimer, 157 F.3d 1082, 1091 (7th Cir. 1998) (noting permissibility of

downward departure where intended loss related to fraud conviction overstated

seriousness of offense in comparison to realistic possibility of actual loss), cert.

denied, 525 U.S. 1184 (1999); United States v. Roth, 934 F.2d 248, 251-52 (10th

Cir. 1991) (affirming upward departure in conviction for theft of military

equipment based on serious effect of conduct upon national security and on value

of property stolen); United States v. Davis, 912 F.2d 1210, 1212-13 (10th Cir.

1990) (affirming upward departure based on large quantity of drugs involved in

drug distribution offenses).  Indeed, the Supreme Court itself recognized that "the

severity of the misconduct, its timing, and the disruption it causes" are factors

which influence a district court's determination of whether the misconduct in a

particular instance makes the case atypical.  Koon, 518 U.S. at 100.

As the guideline now stands, the seriousness of the offense is clearly a

circumstance "not adequately taken into consideration by the Sentencing

Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. Accordingly, we conclude that the district court did not err in determining that the absence of adjustments for the seriousness of the offense under § 2M2.3 is a valid reason for departing.

## 2.

The government also challenges the court's reliance on two specific facts for its departure: (1) that the offense occurred in peacetime, and (2) that it did not involve a foreign power. The government asserts that neither of these is a valid mitigating factor. Turning to the second factor first, there is no error in the court's consideration of the fact that Defendants' conduct was not in aid of a foreign power. This factor is certainly relevant to the seriousness of the offense, and there is no evidence in the Guidelines or the record that it was considered by the Sentencing Commission in formulating § 2M2.3.

The court's consideration of the peacetime factor is somewhat problematic. Whether or not the offense was committed when the United States was at war is relevant to the seriousness of the offense and was suggested as a factor by the proposed amendment, but the existing Guidelines already take the peacetime factor into account. Section 2M2.1 applies to sabotage during wartime, carrying with it an offense level of thirty-two in contrast to the offense level of twenty-six

set by § 2M2.3 for peacetime acts of sabotage. In light of the fact that the Guidelines already take this factor into account, and because there is no evidence that it is present to some exceptional degree, the district court should not have considered it in determining whether to depart. See Collins, 122 F.3d at 1302-03.

Our conclusion that the district court erred in considering that the conduct occurred during peacetime does not end our analysis. In reviewing the mitigating factors, the court considered two additional factors as reasons to depart: (1) whether the offense created a substantial risk of death or injury, and (2) the extent to which national security was threatened. It found that the offense conduct did not create a substantial risk of death or injury nor a significant threat to national security. More importantly, the tenor of the court's discussion of these factors specifically, and the departure generally, as well as the detailed analysis of these two factors indicate that the court gave greater weight to these factors than to the impermissible peacetime factor. See R., Vol. 6 at 43-44. Where a sentencing court has relied on both impermissible and permissible factors for a departure, we are not required to remand if we are satisfied that the district court would impose the same sentence without relying on the improper factor or factors. See Koon, 518 U.S. at 113; United States v. Whiteskunk, 162 F.3d 1244, 1250 (10th Cir. 1998). Based on the record and the district court's analysis in this case, we do not doubt that the district court would impose the same sentence

on Defendants even without relying upon the fact that the offense was committed during peacetime. Cf. United States v. Jones, 158 F.3d 492, 504-05 (10th Cir. 1998) (affirming downward departure despite reliance on two impermissible factors). It is clear that the court departed because Defendants' conduct, while causing more than symbolic property damage, was an act of protest that did not present a significant risk of injury or threat to national security.

For the foregoing reasons, we affirm the district court's downward departure based on § 5K2.0.

AFFIRMED.