**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 28 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

GUADALUPE JOSE-GONZALEZ,

　　　　Defendant - Appellant.

No. 01-1261

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 00-CR-78-S)**

---

Raymond P. Moore, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, and Jenine Jensen, Assistant Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

James C. Murphy, Assistant United States Attorney (John W. Suthers, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **LUCERO** , **ANDERSON** , and **HARTZ** , Circuit Judges.

---

**HARTZ** , Circuit Judge.

---

Defendant, Guadalupe Jose-Gonzalez, appeals his sentence for transporting unlawful aliens. In sentencing Defendant, the district court departed upward from the Sentencing Guidelines range to account for the multiple deaths and injuries resulting from Defendant's criminal conduct. Defendant argues that the court lacked grounds for an upward departure and, even if there were adequate grounds, the extent of departure was unreasonable. We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. We affirm.

I.   *Background*

Defendant was driving at a high rate of speed on a highway in Colorado in the early morning of January 22, 2000, when he lost control of his 1982 Dodge van, causing it to roll over. Sixteen unlawful aliens had been passengers in the van. Two of the passengers were dead when the police arrived on the scene; another passenger died later at a local hospital. Ten other passengers were injured, at least four of them seriously.

The passengers had begun their ill-fated journey at noon the previous day, having paid Defendant to transport them from Arizona to Florida, where they hoped to find work. During the trip the passengers lay on the floor in the back of the van to avoid being seen; the rear seats and safety belts had been removed for this purpose. The van, which was designed to carry only nine passengers, was not in mint condition. Tires of different sizes were mounted on the back axle, and

two lug nuts were missing from the wheels. The passengers were not provided food or water, nor were they allowed to leave the van at any time—not even to relieve themselves. Defendant drove the van continuously, stopping only for gas, from the time they left Arizona until the time of the accident.

Defendant was indicted on one count of knowingly transporting unlawful aliens within the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Conviction under the statute carries a maximum sentence of life in prison or the death penalty if the violation resulted in death. 8 U.S.C. § 1324(a)(1)(B)(iv).

At a non-jury trial, Defendant stipulated that he knew that the passengers were unlawful aliens, that three had been killed, and that others had been seriously injured. He disputed only his motive—whether he had committed the offense for commercial advantage or private financial gain, a possible factor in sentencing. *See* 8 U.S.C. § 1324(a)(1)(B)(i); U.S.S.G. § 2L1.1(b)(i). The court found the mercenary motive and convicted him.

The district court sentenced Defendant in accordance with the United States Sentencing Guidelines (U.S.S.G.) promulgated by the United States Sentencing Commission. Under the Guidelines the permissible sentencing range is determined by the defendant's criminal history and the offense level for the crime. To calculate the offense level, the court looks to the Guidelines section applicable to the offense of conviction to find the base offense level, makes adjustments in

accordance with the Guidelines for specific offense characteristics and other features of the defendant's conduct, and makes further adjustments when there have been multiple counts of conviction. *See* U.S.S.G. § 1B1.1. The sentencing court may depart from the Guideline sentencing range only if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b).

Following the recommendations of the Presentence Investigation Report (PSR), the district court applied Guideline § 2L1.1, entitled "Smuggling, Transporting, or Harboring an Unlawful Alien." Under § 2L1.1(a)(2) Defendant's base offense level was 12. The court then imposed a 3-level enhancement under § 2L1.1(b)(2)(A) because the number of unlawful aliens being transported was between 6 and 24. It further increased the level to 18 in accordance with § 2L1.1(b)(5) for "intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." (Section 2L1.1(b)(5) requires increasing the level by 2 or up to level 18, whichever is greater, so the offense level would have been increased to 18 even without the enhancement for transporting multiple aliens.) Finally, the court added another 8-level enhancement under § 2L1.1(b)(6)(4) because death resulted. (The increase

would be 4 levels for serious bodily injury. *See* U.S.S.G. § 2L1.1(b)(6)(2).) With an offense level of 26 and a criminal history category of I (Defendant had no prior convictions), Defendant's Guideline sentencing range was 63-78 months.

The district court then determined that an upward departure from the Guideline sentencing range was warranted because of the multiple injuries and deaths. In calculating this upward departure, the court followed the suggestion in the PSR that each of the seriously injured or deceased passengers be treated as having been the subject of a separate count of transporting an unlawful alien. Roughly speaking, when a defendant has been convicted of multiple counts, the Guidelines require the sentencing court to divide the counts into distinct groups of closely related counts, compute the offense level for each group, and then determine the combined offense level by increasing the highest offense level for any group by an amount based on the number of "units," which depends upon the number of groups with offense levels comparable to the highest level. *See* U.S.S.G. ch. 3, pt. D. The court here treated each of the three pseudo-counts attributed to a deceased passenger as a separate group with an offense level of 26. It treated each of the four counts attributed to a seriously injured passenger as a separate group with an offense level of 22. Because the offense level for each of the seven groups was within 4 levels of the highest level for any group, under

§ 3D1.4 there would be 7 units and the offense level would be raised by 5 levels[1].

Accordingly, Defendant's total offense level rose from 26 to 31 and the Guideline

sentencing range increased to 108-135 months. The court imposed a prison term

of 120 months. Defendant objected to both the justification for and the method of

departure.

_____

[1]§ 3D1.4 states:

**Determining the Combined Offense Level**

The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
|---|---|
| 1 | none |
| 1 ½ | add **1** level |
| 2 | add **2** levels |
| 2 ½ - 3 | add **3** levels |
| 3 ½ - 5 | add **4** levels |
| More than 5 | add **5** levels. |

In determining the number of Units for the purposes of this section:

(a)  Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from **1** to **4** levels less serious.

(b)  Count as one-half unit any Group that is **5** to **8** levels less serious than the Group with the highest offense level.

(c)  Disregard any Group that is **9** or more levels less serious than the Group with the highest offense level. Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.

II.	*Discussion*

(A)	*Standard of Review*

As previously stated, a sentencing court may depart from the Guidelines only because of circumstances "not adequately taken into consideration by the Sentencing Commission." U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). Congress has instructed the courts to "consider only the Sentencing Guidelines, policy statements, and official commentary of the Sentencing Commission " in determining whether the Sentencing Commission has adequately considered a circumstance. 18 U.S.C. § 3553(b).

*United States v. Collins*, 122 F.3d 1297, 1303 (10th Cir. 1997), set out our approach to appellate review of departures from the Sentencing Guidelines:

> [I]n determining whether the district court abused its discretion in departing from the Guidelines, appellate courts after *Koon* [*v. United States*, 518 U.S. 81 (1996),] must evaluate: (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure, (3) whether the record sufficiently supports the factual basis underlying the departure, and (4) whether the degree of departure is reasonable.

We review all four steps of the departure analysis "under a unitary abuse-of-discretion standard which 'includes review to determine that the discretion [of the district court] was not guided by erroneous legal conclusions.'" *Id.* at 1302

(quoting *Koon,* 518 U.S. at 100). "The deference that is due depends on the nature of the question presented." *Koon*, 518 U.S. at 98. "When the question presented is essentially factual, appellate review should be at its most deferential." *Collins*, 122 F.3d at 1302. But, "[w]hen the issue is essentially legal, . . . appellate review should be plenary." *Id.* at 1303.

(B)     *Departure Factors*

The first question—whether the factual circumstances supporting a departure are permissible departure factors—is essentially a legal one, which we review *de novo.* No deference is due the district court's decision on this issue. *Id*. at 1303.

At the outset we must determine what factors the district court relied upon for departure. Defendant argues that in addition to relying on the deaths and serious injuries, the court relied upon his disregard for human life and dignity as well as his excessive recklessness. Defendant points out that at the sentencing hearing the court observed that Defendant displayed a disregard for human life and dignity and that his recklessness exceeded that contemplated by § 2L1.1(b)(5), which provides for an enhancement for recklessness. Nevertheless, it is clear that the departure was based solely on the deaths and injuries. The judgment specifically states: "Pursuant to U.S.S.G. § 5K2.0, the Court finds and concludes that an upward departure is appropriate because the applicable

guideline in this case, U.S.S.G. § 2L1.1, does not account for the circumstances of multiple injuries or deaths." Moreover, the court's computation of the departure rested solely on the multiple deaths and serious injuries caused by Defendant's offense. Although we may search the record to supply an otherwise absent explanation for why a court departed from the Guidelines, *see United States v. Hannah*, 268 F.3d 937, 942 (10th Cir. 2001), we would be most reluctant to use a court's oral remarks to undermine an explanation for departure that is set out in the judgment and reflected in the court's computation of departure. In any event, the court made clear in its oral remarks that its observations regarding Defendant's recklessness did not affect the sentence. After discussing the evidence of recklessness, the court observed "that even by eliminating the application of this specific offense characteristic[,] pursuant to 3D1.4[ ] the ultimate result would be the same."

Accordingly, we consider only whether an upward departure was permissible on the basis of the multiple deaths and injuries. The Guidelines encourage consideration of death and significant physical injury as grounds for departure. U.S.S.G. § 5K2.1-.2. The court is authorized to depart for such encouraged factors as long as the Guidelines do not already take them into account. *See Koon*, 518 U.S. at 96. Here, there is no question that death and injury are taken into account by the Guideline for transporting unlawful aliens.

Section 2L1.1(b)(6)(4) adds 8 levels "[i]f any person died," and adds lesser amounts for bodily injury, depending on the severity. Defendant goes further, however, and contends that the Guideline takes into account *multiple* deaths and injuries. Defendant points out that (1) § 2L1.1(b)(2) provides for an increase in the offense level if the defendant transported six or more unlawful aliens[2]; (2) application note 6 in the Commentary to § 2L1.1, which expands upon the meaning of "reckless conduct" for purposes of increasing the offense level under § 2L1.1(b)(5), gives examples of reckless conduct involving multiple aliens (such as carrying too many passengers in a vehicle)[3]; and (3) § 2L1.1(b)(6) increases the

_____

[2]§ 2L1.1(b)(2) states:

If the offense involved the smuggling, transporting, or harboring of six or more unlawful aliens, increase as follows:

| Number of Unlawful Aliens Smuggled, Transported, or Harbored | Increase in Level |
| --- | --- |
| (A)  6-24 | add **3** |
| (B)  25-99 | add **6** |
| (C)  100 or more | add **9**. |

[3]The application note states:

Reckless conduct to which the adjustment from subsection (b)(5) applies includes a wide variety of conduct (e.g.,transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded. dangerous, or inhumane condition). If subsection (b)(5) applies solely on the basis of conduct related to fleeing from a law enforcement officer, do not apply an adjustment from § C1.2. (Reckless Endangerment During Flight). Additionally, do not apply the adjustment in subsection (b)(5) if the only reckless conduct that created a substantial risk of death or serious

(continued...)

offense level "[i]f any person died or sustained bodily injury."

We are not persuaded. The increase in offense level for multiple unlawful aliens provided by § 2L1.1(b)(2) is designed to measure the insult to the nation's immigration laws, not the threat of injury to unlawful aliens. The operation of that section and its interplay with those provisions relating to reckless conduct and to death or bodily injury show that the offense-level increases for multiple aliens were not intended as a means of dealing with multiple deaths or injuries. First, under § 2L1.1(b)(2) there is no increase at all for transporting five or fewer aliens (even if all are killed). Likewise, when the offender "intentionally or recklessly creat[es] a substantial risk of death or serious bodily injury to another person," it may be irrelevant, as it was in this case, whether the offender transported only one alien or as many as 24—the offense level increases to 18 regardless. *See* § 2L1.1(b)(5). As for § 2L1.1(b)(6), it makes no distinction between one death or 100; the increase is required "[i]f *any* person died or sustained bodily injury." (emphasis added). In short, none of the Guideline language cited by Defendant indicates that the Guideline computation for the crime of transporting unlawful aliens is intended to take into account the possibility of multiple deaths or injuries and thereby preclude any departure from

---

[3](...continued)
bodily injury is conduct for which the defendant received an enhancement under subsection (b)(4) [relating to firearms and other dangerous weapons].

the Guideline on that ground.

Of course, the Sentencing Commission was aware of the possibility that multiple aliens could be transported and that some might be killed or seriously injured. But the Commission's awareness does not compel the conclusion that the Guidelines address the issue of multiple deaths or injuries. The Commission may well have felt it prudent to await developments in the sentencing courts. *See* U.S.S.G. ch. 1, pt. A, intro. comment 4(b) (Commission will be able to refine Guidelines as it monitors departures by courts). To the extent that Defendant relies on Congressional hearings, debates, and even directives to the Commission as establishing what the Commission must have taken into account, we must refuse to consider his argument. Defendant ignores that 18 U.S.C. § 3553(b) instructs us that "[i]n determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission."

Thus, we conclude that although death and bodily injury are taken into account by § 2L1.1, the Guideline does not foreclose consideration of multiple deaths and injuries as grounds for departure. *Cf. United States v. Whiteskunk*, 162 F.3d 1244, 1249-50 (10th Cir. 1998) (multiple deaths would be permissible ground for departure from involuntary manslaughter Guideline sentencing range). In this circumstance, we apply the rule that if a factor is "an encouraged factor

already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96. This is a "heartland" issue, which we now address.

*(C)    Heartland Analysis*

Under *Collins* the second question to answer is whether the departure factors remove the case from the heartland of the applicable Guideline. The introduction to the Guidelines explains:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. ch. 1, pt. A intro. comment 4(b). In determining whether a case is unusual enough to fall outside the heartland of cases to which a specific Guideline applies,

> the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with

the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.

*Koon*, 518 U.S. at 98.

Although we have said that "the question of what constitutes a guideline's heartland is essentially legal in nature," *United States v. Sicken*, 223 F.3d 1169, 1173 (10th Cir. 2000), we have recognized that "[d]istrict courts . . . have the responsibility of determining in the first instance the factual circumstances that define a particular guideline heartland." *Id*. at 1174. What these statements reflect is that the determination of the heartland is a legal matter to the extent that it relies on interpretation of Guidelines language but a factual matter to the extent that it relies on experience with the type of offense involved to decide whether the facts of the case at hand "are usual or unusual, ordinary or not ordinary, and to what extent." *Id*. at 1173 (quoting *United States v. Rivera*, 994 F.2d 942, 951 (1st Cir. 1993)); *see Rivera,* 994 F.2d at 951 (Breyer, C.J.) ("Plenary review is . . . appropriate where the appellate court . . . will have to perform the quintessentially legal function of interpreting a set of words, those of an individual guideline, in light of their intention or purpose, in order to identify the nature of the guideline's 'heartland'" (internal quotation marks and citation omitted)). An example of an essentially legal heartland issue is whether the "child pornography" Guideline is "aimed only at child pornography consumers

-14-

who are also child molesters, so that a purchaser who is not also a molester falls outside the 'heartland.'" *Id.* at 950; *see also Sicken*, 223 F.2d at 1173-74 (determining that the heartland for sabotage, for which there was only one reported case, consisted of offenses that presented significant harm or risk of harm to national defense).

Defendant argues that this case is not atypical of alien transportation cases. He asserts that the run-of-the-mill case involves both multiple aliens and the possibility of multiple deaths and injuries. He suggests that a case like this could fall outside the heartland of § 2L1.1 only if the vehicle accident had involved many more deaths.

The issue here is one on which we should defer to the district court. The Guidelines' language does not indicate whether this is a typical case. The district court, relying on its own experience and able to turn to court staff for assistance, is far better situated than an appellate court to know whether the extent of death and injury in this case is outside the norm for alien smuggling, transporting, and harboring cases (§ 2L1.1 encompasses all three offenses) in which death results. Defendant directs our attention to several other prosecutions in the same district in which multiple deaths arose out of an alien transporting offense. Even assuming the accuracy of Defendant's assertions, however, we still could not determine how representative such cases are. In particular, we note that the

Guidelines are national in scope, intended to provide a measure of uniformity throughout the country, so what may be common in one district for a period of time may still be unusual for the nation as a whole and outside the heartland for the offense. We find no abuse of discretion by the district court in finding this case to be outside the heartland.

(D)    *Factual Basis for Departure*

We apply a "clearly erroneous" standard to review the factual determinations underlying the decision to depart. *See Collins,* 122 F.3d at 1302. Defendant does not contest the district court's factual determinations. He concedes that this case involved multiple deaths and injuries.

(E)    *Reasonableness*

Finally, we must determine whether the extent of the departure in this case was reasonable. Review of the district court's decision on this matter is deferential. *See Whiteskunk*, 162 F.3d at 1253.

A statement of the factual basis for departure is not in itself a sufficient justification. *See United States v. Walker*, 284 F.3d 1169, 1172 (10th Cir. 2002). The sentencing court must also articulate reasons for the *degree* of departure. *See Collins*, 122 F.3d at 1308. "The district court may use any reasonable methodology hitched to the Sentencing Guidelines to justify the reasonableness of the departure, which includes using extrapolation from or analogy to the

Guidelines." *Id.* at 1309 (internal quotation marks and citation omitted).

In calculating the departure in this case, the district court treated the transportation of each killed and seriously injured passenger as a separate pseudo-count, treated each such count as a separate group, and then determined the offense level under U.S.S.G. § 3D1.4. Thus, the methodology for the departure was "hitched" to the Guidelines. Defendant contends, however, that the methodology violates the rules in the Guidelines.

Defendant argues that the degree of the court's upward departure was unreasonable because the resulting sentence far exceeds what he would have received had he in fact been charged with separate counts of transporting aliens for each alien killed or injured. He relies on authority that "the reasonableness of a departure may be evaluated by treating the aggravating factor as a separate crime and asking how the defendant would be treated if convicted of it," *United States v. Terry*, 142 F.3d 702, 709 (4th Cir. 1998) (internal quotation marks and brackets deleted), and that increasing the sentence by more than "the defendant would have received for a separate conviction creates more distortion than the regular guideline procedure." *United States v. Nagra*, 147 F.3d 875, 886 (9th Cir. 1998) (internal quotation marks and brackets deleted).

We have no quarrel with the quoted propositions. The question, however, is whether Defendant is correct regarding how he would have to be sentenced

under the Guidelines if he had been charged with separate counts for each of the unlawful aliens.

The foundation of Defendant's argument is the assertion that if he had been charged with multiple counts, the counts would have to be combined together under § 3D1.2(d) to form one group for sentencing purposes. This treatment, as opposed to putting separate counts in separate groups (which is what the district court did), has significant consequences in determining the combined offense level for all the counts.

We have already summarized how the district court's computation led to an offense level of 31, representing a departure from the Guideline level of 26. Defendant's approach—combining all counts in one group—would, however, simply lead to a level of 26—no departure whatsoever. His method of calculation would proceed as follows: For each count the base level would be 12 under § 2L1.1(a)(2). There would be no increase under 2L1.1(b)(2) for the number of aliens transported because each alien would be represented in a separate count. Nevertheless, the level for each count would be increased to 18 under § 2L1.1(b)(5) for recklessness.[4] Then the counts relating to an alien who was

_____

[4]A footnote in Defendant's brief challenges the application of the recklessness enhancement when assuming separate counts for each alien. Ignoring his speeding, driving without rest, removal of seatbelts, etc., he contends that the only possible ground for finding recklessness was overcrowding of the van, a factor which, in his view, must disappear if each count relates to only one unlawful alien. We find no merit
(continued...)

killed would be increased by 8, to offense level 26, in accordance with § 2L1.1(b)(6)(4), while those counts relating to seriously injured aliens would be increased by 4, to offense level 22, in accordance with § 2L1.1(b)(6)(2). Combining all counts in one group would add only one feature to this computation. If all transporting counts were to be combined within one group, the offense level for the group would be identical to the highest level for any of the individual counts, adjusted only by treating the number of unlawful aliens transported by Defendant as 16 rather than 1. *See* § 3D1.3(b). (Under the facts in this case, we need not consider how the Guidelines would compute the group offense level when an enhancement applies only to a count in the group other than the count with the highest offense level.) Treating the number of aliens transported as 16 rather than 1 would not, however, change the offense level for any count. Under § 2L1.1(b)(2)(A) the base offense level of 12 would be increased by 3, to 15, because 6-24 aliens were transported. But under § 2L1.1(b)(5) the level is increased to 18 for recklessness, just as before. (Section 2L1.1(b)(5) increases the level by 2 or to level 18, whichever is greater.) The highest offense level for any count, and thus the offense level for the group, would be 26, the same level from which the district court departed.

What Defendant fails to acknowledge, however, is that the grouping rules

[4](...continued)
to this challenge to the recklessness enhancement.

he uses may not be mandatory in a case like this. One must look not only to the rules themselves, but also to the explanation behind them, because the Guidelines permit, even encourage, departure when the rationale behind a rule does not apply. When the rationale does not apply, it is clear that a factor is present that was "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." § 5K2.0 (quoting 18 U.S.C. § 3553(b)).

The grouping rule on which Defendant relies is § 3D1.2, which states in pertinent part:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

> (a)   When counts involve the same victim and the same act or transaction.

> (b)   When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

> (c)   When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustments to, the guideline applicable to another of the counts.

> (d)   When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

> *Offenses covered by the following guidelines are*

*to be grouped under this subsection*:

. . .

§ 2L1.1 . . . .

(emphasis added). The explanation for the grouping rules is stated in the Commentary. The reason for grouping offenses covered by § 2L1.1 is that all such offenses share the same single victim—the societal interest in controlling immigration. Application Note 2 states:

> The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. *For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related.* Where one count, for example, involves unlawfully entering the United States and the other involves possession of fraudulent evidence of citizenship, the counts are grouped together because the societal interests harmed (the interests protected by laws governing immigration) are closely related. In contrast, where one count involves the sale of controlled substances and the other involves an immigration law violation, the counts are not grouped together because different societal interests are harmed. Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, i.e., to identify and group "counts involving substantially the same harm."

(emphasis added.) When, however, the gist of the offense is injury to persons, the

-21-

offense against each human victim belongs in a different group, even when the offenses arose out of a single event. The Background portion of the Commentary to § 3D1.2 contains the following explanation:

> A primary consideration in this section is whether the offenses involve different victims. For example, a defendant may stab three prison guards in a single escape attempt. Some would argue that all counts arising out of a single transaction or occurrence should be grouped together even when there are distinct victims. Although such a proposal was considered, it was rejected because it probably would require departure in many cases in order to capture adequately the criminal behavior. *Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together.* Counts involving different victims (or societal harms in the case of "victimless" crimes) are grouped together only as provided in subsection (c) or (d).

(emphasis added).

Once the rationale for grouping offenses under § 2L1.1 is understood, it is apparent that the rationale is not fully applicable here. Indeed, the Guidelines commitment not to group offenses having different human victims suggests that the district court's approach to grouping offenses in this case would not only be tolerated by the Guidelines but would be encouraged as a logical extrapolation of Guidelines principles. The computation under the Guidelines of the offense level for each of the seven pseudo-counts treated as a separate group by the district court indicates that the offense level reflects concern for human safety as much as

concern for immigration policy.  The offense level of 15 (the base level of 12, increased by 3 because of the number of aliens transported) represents the threat to the societal interests in protecting our borders.  The offense-level increases that reflect the interests in protecting human life and limb are of comparable magnitude:  an increase from 12 to 18 for recklessness, and either an increase of 8 for death, or an increase of 4 for serious bodily injury.  (An increase of 14 in offense level increases the maximum sentence by more than a factor of 4.)  It was therefore appropriate to group (or, more accurately, not group) those pseudo-counts as if each was predicated on injury to a separate human victim.

In short, we disagree with Defendant's assertion that the district court miscalculated what the combined offense level would have to be if he had been prosecuted on separate counts for each alien.  The district court's treatment of each pseudo-count involving death or serious injury as a separate group was well within the court's sound discretion, thereby satisfying the requirement of reasonableness in the degree of departure.

III.   *Conclusion*

We AFFIRM Defendant's sentence.