FILED
United States Court of Appeals
Tenth Circuit

**July 1, 2008**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

No. 07-2007

ISRAEL MUNOZ-TELLO,

    Defendant-Appellant.

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 06-0607 MCA)**

Joseph W. Gandert, Assistant Federal Public Defender, Albuquerque, NM for Defendant-Appellant

David N. Williams, Assistant United States Attorney (Larry Gomez, Acting United States Attorney, with him on the brief), Albuquerque, NM for Plaintiff-Appellee

Before **MURPHY, EBEL** and **O'BRIEN**, Circuit Judges.

**EBEL**, Circuit Judge.

    Before daybreak on February 23, 2006, Defendant-Appellant Israel Munoz-Tello ("Munoz") rolled the Chevrolet Suburban he was driving on a New Mexico

highway. With Munoz in the vehicle were eleven unlawful aliens bound for Atlanta, Georgia. Four of his passengers died; several others suffered severe injuries. As a result, a federal grand jury indicted Munoz, charging him with seven violations of immigration laws barring the transport of illegal aliens. Munoz pled guilty to four counts of Transporting an Illegal Alien Resulting in Death, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(iv).

In sentencing Munoz to 96 months in prison, the district court decided to (1) increase his base offense level pursuant to U.S. Sentencing Guidelines ("U.S.S.G.") § 2L1.1(b)(5) for recklessly endangering his passengers, and (2) depart upward from Munoz's advisory guidelines range because the accident resulted in four deaths. In departing upwards, the court employed a paradigm for departures approved of by this court in United States v. Jose-Gonzalez, 291 F.3d 697 (10th Cir. 2002). Munoz lodged timely objections to both the enhancement and the upward departure; he now renews his objections on appeal. We exercise jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, and affirm.

I.    BACKGROUND

Munoz, a Mexican citizen, has shuttled back and forth between Atlanta and Hidalgo, Mexico for about a decade. Immigration records reveal that Munoz has been apprehended by the U.S. Border Patrol on eleven prior occasions.[1]

---

[1]Munoz's presentence report ("PSR"), prepared by the U.S. Probation
(continued...)

The Accident

Just before 5:00 a.m. on February 23, 2006, deputies from the Santa Fe County Sheriff's Office arrived at the scene of a single-vehicle accident alongside the southbound lanes of State Highway 599. The deputies noted that a 1997 Chevrolet Suburban had crashed; twelve individuals, suffering from various injuries, were strewn about the crash site. The Suburban had rolled over three times, throwing all the passengers out of the vehicle. Emergency medical crews arrived, and declared four of the passengers dead at the scene of the accident.[2] Ambulance crews took three other passengers – and Munoz – to a Santa Fe hospital.[3] Because of their critical injuries, two other passengers were airlifted to an Albuquerque hospital.[4] Two passengers suffered only minor injuries.

---

[1](...continued)
Office, notes that "[o]n three of the occasions," all in 2005, Munoz "was identified as the driver of vehicles transporting illegal aliens into the United States." After each of the eleven apprehensions, Munoz voluntarily returned to Mexico.

[2]The deceased were identified as Libiardo Salvador-Gomez, age 15; Martin Pedraza-Vega, age 32; Rogelio Pedraza-Valdez, age 18; and Javier Cruz-Urbina, age 26. According to the New Mexico Office of the Medical, each died from blunt force trauma to the skull.

[3]These passengers were identified as Gabriel Garcia, age 38; Jorge Guzman-Meza, age 31; and Javier Cruz-Franco, age 17.

[4]These passengers, Juliana Garcia and Jose Antonia Garcia-Mondragon, were both 15 years old. The PSR and the sentencing hearing testimony elucidated the extent of the injuries suffered by the passengers who survived the accident. The impact of the crash had detached one passenger's leg. Another passenger

(continued...)

With the exception of Munoz, none of the Suburban's occupants was wearing a seatbelt. Indeed, Munoz had instructed two 15-year-old passengers to lie down in the Suburban's rear cargo area for the duration of the drive. The PSR asserted, based on the expertise of an immigration official and a Santa Fe Chevrolet dealer, that a 1997 Suburban is built to transport eight adults, total. Deputy Bill Ritch – a Santa Fe police officer who participated in efforts to reconstruct how the accident occurred – corroborated this assessment of the vehicle's rated occupant capacity.

After the accident, immigration officials interviewed two of Munoz's passengers. Both indicated that they had illegally entered the United States and were being driven to Atlanta by Munoz. Both stated that Munoz had been driving for over ten hours at the time of the accident. Investigators also spoke with Munoz. Munoz reported that a person unknown to him had given him $600 in driving expenses to drive eleven illegal aliens from Phoenix to Atlanta. According to Munoz, the crew of twelve left Phoenix at approximately 6 p.m.; he had driven straight through the night, traveling back roads to avoid detection. He claimed that the Suburban rolled after he swerved to avoid debris in the road.

---

[4](...continued)
had extensive head injuries, which required surgery and prolonged physical therapy. A third passenger remained in a coma at the time of the sentencing hearing.

During the sentencing hearing, Deputy Ritch explained the accident reconstruction process and its results. He testified that "based on the evidence, it looked like the driver had fallen asleep because the tire marks were just in a straight drift off the road" until they turned sharply when the driver awoke and overcorrected.[5] While Munoz maintained that he swerved to avoid debris in the roadway, Deputy Ritch noted that he had found no debris in the roadway when he inspected the highway on the morning of the accident. Nonetheless, the only first-hand account of what occurred is Munoz's; the passengers who survived the crash indicated that they were asleep at the time of the accident.

The Criminal Charges

On March 21, 2006, a federal grand jury returned a seven-count Indictment against Munoz.[6] Pursuant to a plea agreement, Munoz pled guilty to Counts 4, 5, 6, and 7, Transporting an Illegal Alien Resulting in Death (in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) & 1324(a)(1)(B)(iv), and Aiding and Abetting (in

---

[5]Deputy Ritch also estimated that the vehicle was traveling approximately 58 to 67 miles an hour, a legal speed for that stretch of highway.

[6]Counts 1 and 2 of the Indictment charged Munoz with Transporting an Illegal Alien and Creating a Substantial Risk of Death, and Aiding and Abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), 1324(a)(1)(B)(iii) and 1324(a)(1)(A)(v)(II). Count 3 charged Munoz with Transporting an Illegal Alien Resulting in Serious Bodily Injury, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and 1324(a)(1)(B)(iii), and Aiding and Abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II).

violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II)).  The government dismissed counts 1, 2 and 3 after Munoz's plea.

The Presentence Report

The probation office calculated Munoz's total offense level and criminal history category using the 2005 Guidelines.  The PSR set Munoz's base offense level at 12, pursuant to U.S.S.G. § 2L1.1(a)(2).[7]  Because Munoz's offense "involved the smuggling, transporting, or harboring of" between six and twenty-four unlawful aliens, the probation office tacked on three levels.  See U.S.S.G. § 2L1.1(b)(2)(A).  Another three levels were added because Munoz's offense "involved intentionally or recklessly creating a substantial risk of death or serious bodily injured to another person" under U.S.S.G. § 2L1.1(b)(5).[8]  The probation office added eight more levels as required by § 2L1.1(b)(6) because a person died as a result of Munoz's accident.  Munoz accepted responsibility for his offenses, and, accordingly, the probation office deducted three offense levels.  See U.S.S.G. § 3E1.1.  Summed, these specific offense characteristic adjustments resulted in a total offense level of 23.  Munoz has no prior criminal convictions,

---

[7]Pursuant to U.S.S.G. § 3D1.2, the four counts to which Munoz pled guilty are grouped to a single offense level.

[8]Under U.S.S.G. § 2L1.1(b)(5), the defendant's offense level is increased by two levels, unless the resulting offense level remains less than 18.  In that case, it is automatically raised to level 18.

which placed him in criminal history category I.[9]  These two metrics set Munoz's advisory sentencing guidelines range at 46 to 57 months in custody.

However, the probation office identified a factor that it felt warranted an upward departure from that range.  Looking to U.S.S.G. § 5K2.1, the probation office reasoned that the four deaths caused by the accident "were not adequately taken into consideration" by the other guidelines.  Accordingly, rather than a 46 to 57 month sentence, the probation office recommended a sentence of 87 months for each count, to be served concurrently.  The probation office arrived at this figure by departing upward four levels – to a total offense level of 27 – on the ground that this situation could be analogized to "the rules of grouping multiple counts under U.S.S.G. § 3D1.4, and other similar convictions such as Involuntary Manslaughter."  This, the PSR stated, would account for the multiple victims of the accident (who would otherwise not affect Munoz's sentence because of the grouping of the four counts to which Munoz pled guilty).

Munoz objected both to the § 2L1.1(b)(5) enhancement and the recommended upward departure.  He also requested a downward variance, marshaling letters from many of his family members in support of his request.  Each testified to Munoz's good character, casting him as a hard-worker, a caring

---

[9]The probation office noted, however, that the U.S. Border Patrol had apprehended Munoz on eleven prior occasions, and each time had allowed him to return voluntarily to Mexico.

family member, and a generally virtuous person. For its part, the government moved for an upward departure, seeking a sentence of 96 months. In response to Munoz's objections, the probation office resolutely asserted that Munoz acted recklessly (by driving for ten hours at night in an overloaded vehicle) and that an upward departure was warranted.

The Sentence Imposed by the District Court

At the sentencing hearing, the court engaged in an extended colloquy with Munoz's counsel and the government attorney regarding whether Munoz's conduct was reckless. Judge Armijo then adopted the PSR's factual findings and also incorporated the testimony presented at the hearing. Based on the evidence before her, the sentencing judge found that the Suburban driven by Munoz was "substantially overloaded and overcrowded," which "made the defendant's vehicle less safe because there were not seats or seat bets [sic] for all of the vehicle's occupants." The situation was especially unsafe, the court found, for the two passengers whom Munoz instructed to lie down in the cargo area. The court also found it "likely that the overloading of the vehicle adversely affected its handling and maneuverability." Finally, the court cited the "duration of this defendant's journey" as added support for her conclusion that Munoz acted recklessly enough to justify the § 2L1.1(b)(5) enhancement.

As for the upward departure, the court looked to U.S.S.G. § 5K2.1 and the "methodology articulated" in Jose-Gonzalez. As noted above, U.S.S.G. § 3D1.2

directs the court to "group" the four counts to which Munoz pled guilty and to assign that "group" the offense level "for the most serious of the counts comprising the Group," U.S.S.G. § 3D1.3(a). Citing <u>Jose-Gonzalez</u>, the court noted that the rationale for this rule is that the "victim" contemplated by the offense is "the same single victim – the societal interest in controlling immigration." Here, however, there were human victims. Thus, the court felt it necessary to forego the "grouping" rule and instead extrapolate from § 3D1.4.

Under U.S.S.G. § 3D1.4,[10] the court counted the four decedents enumerated in counts 4 through 7 of the Indictment (the courts to which Munoz pled guilty) as

---

[10] In relevant part, § 3D1.4 provides:

> The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| **Number of Units** | **Increase in Offense Level** |
| --- | --- |
| . . . | . . . |
| 3 ½ – 5 | add **4** levels |
| More than 5 | add **5** levels. |

> In determining the number of Units for purposes of this section:
>
> (a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from **1** to **4** levels less serious.
>
> . . . .

U.S.S.G. § 3D1.4.

one unit each, and added two more units for the seriously injured passengers. These six total units correlated to a five-level upward departure, resulting in a guideline range of 78 to 97 months.[11] The court, after carefully reconciling the advisory guidelines sentence (and its planned upward departure) with the 18 U.S.C. § 3553(a) sentencing factors, imposed a sentence of 96 months for each of

---

[11]The sentencing court considered each of the four grouped counts as individual "pseudo-counts." Each of those "pseudo-counts" would result in an offense level of 23: Although the specific offense characteristic enhancement for the number of aliens transported (§ 2L1.1(b)(2)) drops out, the recklessness enhancement provides for a bump to at least level 18 regardless. See U.S.S.G. § 2L1.1(b)(5). And the fact that Munoz's conduct resulted in the death of "any person" for each of those four "pseudo-counts" adds 8 levels to that level 18. See U.S.S.G. § 2L1.1(b)(6). Munoz's acceptance of responsibility drops that level three notches, see U.S.S.G. § 3E1.1, resulting in a final offense level of 23 for each of the four "pseudo-counts." Treating each of those "pseudo-counts" as a Group for purposes of § 3D1.4, this adds up to four units because each offense Group is "equally serious." U.S.S.G. § 3D1.4(a).

The court then added "pseudo-counts" for each of the two seriously injured passengers. The base offense level for Munoz's offense relating to these two passengers would be 12. See U.S.S.G. § 2L1.1(a)(2). The § 2L1.1(b)(5) recklessness increase again elevates the offense level to 18. Section 2L1.1(b)(6) provides for a four-level bump if the victim suffered "Serious Bodily Injury" and a six-level bump if the person suffered "Permanent or Life-Threatening Bodily Injury." Even using the lesser of these increases, the resulting offense level would be 22. Again, Munoz's contrition drops this down three levels to 19. As such, each of the two "pseudo-counts" for seriously injured passengers would count as one unit under § 3D1.4(a) because each of those "Groups" is only "4 levels less serious" than the "highest offense level" Group.

Altogether, the sum is six units. Section 3D1.4 instructs that if calculations result in "[m]ore than 5" units to "add 5 levels" to the offense level. Returning from the world of "pseudo-counts" to Munoz's actual offense level (23), this five-level upward departure would result in an offense level of 28. The court combined this offense level with Munoz's criminal history category of I and arrived at a range of 78 to 97 months' imprisonment.

the four counts, to be served concurrently.  The sentencing court's memorandum opinion and order, issued December 11, 2006, tracks the analysis announced by the court during the sentencing hearing.

## II.    DISCUSSION

After United States v. Booker, 543 U.S. 220, 260-62 (2005), we review sentences using the rubric of reasonableness, as informed by the 18 U.S.C. § 3553(a) sentencing factors.  See Gall v. United States, 128 S. Ct. 586, 594 (2007). The Supreme Court has clarified that reasonableness review amounts to an abuse of discretion standard of review, see id., and that this standard applies "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range," id. at 597.

### A. Munoz's Challenge to the § 2L1.1(b)(5) Enhancement

Munoz advances two interrelated arguments that the § 2L1.1(b)(5) adjustment was inapplicable.  First, he disputes certain factual findings on which the district court predicated its holding; second, he asserts that the district court erred in holding, as a matter of law, that his conduct was within the scope of the recklessness enhancement.

#### 1. Standard of Review

When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error, "giving due deference to the district court's application of the

- 11 -

guidelines to the facts." United States v. Wolfe, 435 F.3d 1289, 1295 (10th Cir. 2006) (quotation omitted); see also United States v. Todd, 515 F.3d 1128, 1135 (10th Cir. 2008). A clearly erroneous finding is one that "is simply not plausible or permissible in light of the entire record on appeal." United States v. McClatchey, 316 F.3d 1122, 1128 (10th Cir. 2003) (quoting United States v. Torres, 53 F.3d 1129, 1144 (10th Cir. 1995)).[12]

## 2. Merits
*a. Munoz's challenges to the district court's factual findings*

Before addressing § 2L1.1(b)(5)'s ambit, we must first consider Munoz's contention that the sentencing court clearly erred with respect to three factual findings that relate to the § 2L1.1(b)(5) enhancement.[13]

First, the sentencing court found the Suburban's middle-row "lap belts were tucked behind the seat such that they could not be accessed or used by the passengers." In so finding, the court credited Deputy Ritch's testimony regarding

---

[12]The government bears the burden of proving each element of a sentencing enhancement. United States v. Forsythe, 437 F.3d 960, 963 (10th Cir. 2006) (quoting United States v. Campbell, 372 F.3d 1179, 1183 (10th Cir. 2004)). Accordingly, the "government must prove by a preponderance . . . any findings necessary to support a sentence enhancement." United States v. Tindall, 519 F.3d 1057, 1063 (10th Cir. 2008).

[13]Munoz challenged only one factual aspect of the PSR: its statement that the seatbelt of the middle seat in the middle row was inaccessible or inoperable. The sentencing court accepted the remainder of the PSR's factual findings. See Fed. R. Crim. P. 32(i)(3)(A). However, the PSR did not include the other factual findings – at least in the way Judge Armijo framed them – that Munoz challenges here.

the seatbelts' accessibility and discounted the testimony of the Federal Public

Defender's investigator, Maclovia Guardiola.  Munoz disputed this matter below,

triggering the judge's fact-finding and explanatory duties under Federal Rule of

Criminal Procedure 32(i)(3)(B).[14]  Here, Munoz objects only to the result of the

fact-finding.  In support of his objection, Munoz offers photographic evidence

that he believes evinces the court's clear mistake regarding the seatbelt.

We, however, do not believe that the court clearly erred.  Whereas Ritch

inspected the Suburban on the morning of the crash, Guardidiola's investigation

took place nine months later.  As Guardidiola admitted on the stand, ample

evidence suggested that the Suburban's condition had changed during that time.

Moreover, Munoz's photographic evidence is ambiguous.  Because Munoz's

---

[14]At the court's request, Ritch reviewed his testimony on the seatbelt issue. Using the government's exhibit 4 as an aid, Ritch testified:

> If you look at the center of the picture, . . . there is a passenger compartment or seat there, and then there is the center seat.  If you look right between that gap there, you see where the belt is stuck underneath the seat and not available to the occupants.

He noted that this was the way he found the seatbelt when he surveyed the Suburban the morning of the crash.  On cross-examination, Munoz's attorney asked only about the seatbelt of the middle row's center seat.

Thus, it is clear from the sentencing hearing's transcript that the accessibility of only one seatbelt was in dispute: the middle seat in the Suburban's middle row.  As such, we will assume that the district court merely misspoke when it found that the "lap belts" were tucked behind the seat. Regardless, the district court noted that her § 2L1.1(b)(5) conclusion did not depend on her finding regarding the middle row seatbelts: "Even accounting for the three belts in the middle row, there were still not enough seats or seat belts for all the vehicle's occupants."

photographs do not unequivocally controvert the district court's conclusion, we defer to the court's assessment of the sentencing-hearing testimony.  See United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005) (noting that it is the province of the district court to evaluate witness credibility, weigh the evidence, and draw inferences therefrom).

Second, the court found that the Suburban was "substantially overloaded and overcrowded" because it contained twelve persons instead of eight, its rated capacity.  Further, because of this overcrowding, "[e]ven accounting for the three seat belts in the middle row, there were still not enough seats or seat belts for all the vehicle's occupants."  Munoz challenges the sentencing court's characterization of the vehicle as overcrowded, arguing that the government adduced no evidence regarding the size of Munoz's passengers.  Munoz reasons that, without this evidence, the court could not have concluded the Suburban was "overcrowded" in light of the spaciousness of the Suburban's interior.

Again, we discern no clear error.  Regardless of the size of the passengers and the size of the vehicle's interior, it is undisputed that Munoz carried twelve in a vehicle rated for eight.  Even after Munoz relegated two passengers to the cramped rear cargo area, four passengers would have had to sit in each of the two rear bench seats (which are designed for three passengers apiece).[15]

---

[15]Even if we were inclined to agree with Munoz's semantic distinction
(continued...)

Third, the court found that it was "also likely that the overloading of the vehicle adversely affected its handling or maneuverability . . . ." Munoz asserts that the sentencing court assumed this fact without adequate support in the record; Munoz further argues that this was not the type of fact subject to judicial notice pursuant to Federal Rule of Evidence 201(b).

We agree. There was little evidence, if any, in the record that supports this assumption. The government's accident reconstruction expert, Deputy Ritch, did not explicate any basis for this particular finding. Nor did the government ever argue the predicate facts for such a finding (such as the vehicle's center of gravity, the vehicle's weight when fully loaded, and the additional weight of the passengers). Accordingly, in light of the entire record on appeal, this factual conclusion is clearly erroneous. See McClatchey, 316 F.3d at 1128; see also Carley v. Wheeled Coach, 991 F.2d 1117, 1126 (3d Cir. 1993) (holding that "rollover propensities of vehicles" are not matters of common knowledge and hence "not the kind of readily ascertainable facts that satisfy [Federal] Rule [of Evidence] 201(b)"). But see United States v. Torres-Flores, 502 F.3d 885, 890

---

[15](...continued)
between "overloaded" and "overcrowded," evidence in the record supports the district court's finding. Specifically, the government did adduce the ages of Munoz's passengers (none of whom were younger than 15); the court could have deduced the approximate size of the passengers from this information.

- 15 -

n.8 (9th Cir. 2007) ("Severely overloading a vehicle is likely to make it more difficult to handle, thereby increasing the likelihood of an accident.").[16]

>    *b. Munoz's challenge to the district court's conclusion that his conduct recklessly created a substantial risk of death or serious bodily injury*

The next issue is whether the court's undisputed factual findings – and those findings that survive Munoz's clear error challenge – support the conclusion that Munoz acted recklessly. We concur with the district court's decision to apply the § 2L1.1(b)(5) enhancement.

Section 2L1.1(b)(5) provides for an increase to the defendant's base offense level[17] "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person . . . ." U.S.S.G. § 2L1.1(b)(5). The guideline's commentary clarifies that:

>    [r]eckless conduct to which the adjustment from subsection (b)(5) applies includes a wide variety of conduct (e.g., transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle

---

[16]This factor did not occupy a determinative role in the district court's conclusion. It only found that it was "likely" that the overloading "adversely affected" the handling of the vehicle. Thus, it is apparent that the district court did not believe that a definitive finding on this factor, nor a quantitative determination of its effect, were necessary. The other factors, which the district court did definitively find, more than adequately supported the court's ultimate conclusion that the defendant intentionally or recklessly created a substantial risk of death or bodily injury.

[17]As noted above, § 2L1.1(b)(5) requires the court to increase the base offense level by two or, if the resulting offense level would be under 18, up to level 18.

- 16 -

or vessel, or <u>harboring persons in a crowded, dangerous, or inhumane condition</u>).

U.S.S.G. § 2L1.1 cmt. n.6 (emphasis added).[18]  However, the commentary does not "foreclose the enhancement's application to other dangerous conditions." <u>United States v. Aranda-Flores</u>, 450 F.3d 1141, 1144 (10th Cir. 2006).

Our § 2L1.1(b)(5) inquiry essentially equates to a totality of the circumstances test.  <u>See Aranda-Flores</u>, 450 F.3d at 1145; <u>see also</u> <u>United States v. Solis-Garcia</u>, 420 F.3d 511, 516 (5th Cir. 2005) ("Defining the contours of this enhancement is dependent upon carefully applying the words of the guideline in a case-specific analysis.").  In assessing whether the enhancement was appropriate, we must focus exclusively on the defendant's <u>conduct</u>, ignoring the <u>results</u> of that conduct.  <u>See Aranda-Flores</u>, 450 F.3d at 1144.

Although the commentary to § 2L1.1(b)(5) suggests some flexibility in determining whether a defendant's conduct warrants the enhancement, § 2L1.1(b)(5) does have bounds.  Interpreting this very guideline, we have stated that "[r]eckless conduct, in the criminal context, is considered a form of intentional conduct because it includes an element of deliberateness – a <u>conscious</u> acceptance of a known, serious risk."  <u>Id.</u> at 1145 (quoting <u>United States v.</u>

---

[18]This court may accept "commentary in the Guidelines Manual that interprets or explains a guideline [as] authoritative unless it violates the Constitution or a federal statute" or is plainly inconsistent with the guideline. <u>Stinson v. United States</u>, 508 U.S. 36, 38 (1993).

<u>Serawop</u>, 410 F.3d 656, 663 n.4 (10th Cir. 2005) (internal quotation marks omitted and emphasis added). Reckless conduct therefore "necessarily excludes conduct which is merely negligent." <u>Id.</u> (quoting <u>Sutton v. Utah State Sch. for the Deaf & Blind</u>, 173 F.3d 1226, 1238 (10th Cir. 1999)). Moreover, we must disregard the "baseline risk . . . inherent in all vehicular travel," delving instead into whether the defendant's conduct or his chosen method of transportation "increase[d] the risk [of] an accident" and whether the method of transportation exacerbated the risk of death or injury in the event of an accident. <u>Torres-Flores</u>, 502 F.3d at 889-90.

The plain language of the commentary accompanying § 2L1.1(b)(5) compels us to conclude that Munoz's conduct warranted the enhancement. In relevant part, the comment explains that the enhancement applies to conduct such as, "<u>carrying substantially more passengers than the rated capacity of a motor vehicle</u> . . . <u>or harboring persons in a crowded, dangerous, or inhumane condition</u>." U.S.S.G. § 2L1.1 cmt. n.6 (emphasis added). As the district court found, Munoz carried substantially more passengers than the rated capacity of the Suburban. Additionally, even with two people confined to the cargo area, the passengers in the two middle rows would have had to sit four to a row, an arrangement the district court considered crowded. Because those rows typically carry only three passengers, even in the best-case scenario at least two more of

Munoz's passengers would have gone without a safety restraint.[19]  Therefore, at least four of Munoz's passengers lacked a safety restraint, a situation which the district court rightly regarded as dangerous.[20]  The danger was even more pronounced for the two passengers who Munoz concealed in the rear cargo area. Munoz's vehicle was 50% over its capacity, and this left some of its occupants without seats and more without seatbelts.  As such, the plain language of § 2L1.1(b)(5)'s commentary sweeps in Munoz's conduct.

The cases Munoz relies on are not to the contrary.  In <u>Aranda-Flores</u>, this court held that § 2L1.1(b)(5) enhancement was not warranted where the defendant, transporting four passengers in a car designed to carry five occupants, fell asleep after driving for over eight hours straight and crashed the car.  <u>Aranda-Flores</u>, 450 F.3d at 1144-45.  We concluded that the defendant's conduct in that case did not involve "extreme and obviously dangerous conditions" such as carrying substantially more passengers than the rated capacity of a vehicle or placing those passengers in areas without seats or seatbelts.  <u>Id.</u>

Somewhat similarly, the Fifth Circuit has held that, without other "aggravating factors," merely transporting four aliens in the cargo area of a

---

[19]Indeed, it is possible that <u>none</u> of the passengers in the bench row seats would have had accessible seatbelts because squeezing four people into a row typically renders the seatbelt buckles inaccessible.

[20]Suffice it to say that traveling the 1850-odd miles from Phoenix to Atlanta at highway speeds without a seat belt is a hazardous endeavor.

minivan without seatbelts does not warrant the § 2L1.1(b)(5) enhancement.  See

Solis-Garcia, 420 F.3d at 516 ("The § 2L1.1(b)(5) enhancement as written . . .

does not extend so far as to increase punishment for offenders simply for

transporting illegal aliens without requiring them to wear seatbelts.").  However,

the Solis-Garcia court noted that, on the facts before it, "it [was] not asserted that

the van was overcrowded, that Solis was undertaking a particularly long and/or

unsafe journey, or that the aliens were subjected to any other risks."  Id.  Of

course, the court implied, such circumstances might exacerbate the risk posed by

having passengers ride in the cargo area without seatbelts.  Id.

Here, the circumstances include the factors in Aranda-Flores (prolonged

nocturnal driving) as well as the factor in Solis-Garcia (transporting passengers

without seatbelts).  Munoz endeavored to drive through the night, attempting to

push through to Atlanta as quickly as possible.[21]  As the district court put it,

"[t]he length of this journey and the amount of time [Munoz] was spending

behind the wheel" increased the odds that an accident would occur.  Cf. United

States v. Flores-Flores, 356 F.3d 861, 862-63 (8th Cir. 2004) (affirming

enhancement where defendant "voluntarily elected to smuggle eleven individuals .

---

[21]The risks of driving while drowsy – especially at night – are well-documented.  See, e.g., Nat'l Center on Sleep Disorders Research / Nat'l Highway Traffic Safety Administration, Drowsy Driving and Automobile Crashes, http://www.nhtsa.dot.gov/people/injury/drowsy_driving1/Drowsy.html (noting that nocturnal driving and driving for long periods are "chronic predisposing factors" that have cumulative risk).

. . in an overloaded van on a nonstop two thousand mile trip over interstate highways" and failed to ensure driver he selected remained awake).

Moreover, Munoz instructed two passengers to lie in the cargo area. This course of action amplified the harm an accident – if one occurred – would cause. See United States v. Zuniga-Amezquita, 468 F.3d 886, 890 (5th Cir. 2006) (stating that § 2L1.1(b)(5) enhancement "is warranted if a method of transportation exposes aliens to a substantial risk, in the event of an accident, of death or serious bodily injury"); United States v. Miguel, 368 F.3d 1150, 1155-56 (9th Cir. 2004) (affirming enhancement where defendant's vehicle carried more passengers than rated capacity, children were forced to lie down without restraints, and extreme temperature affected passengers). Cf. United States v. Rodriguez-Mesa, 443 F.3d 397, 403 (5th Cir. 2006) (upholding enhancement where defendant transported alien in special compartment in minivan's console which required alien to contort his head and body to stay concealed).

Lastly, even with two passengers in the cargo area, the Suburban was so overloaded that at least two more of Munoz's passengers lacked safety restraints. Again, this ratcheted up the potential harm an accident would inflict. See United States v. Ortiz, 242 F.3d 1078, 1079 (8th Cir. 2001) (concluding that district court did not clearly err in applying § 2L1.1(b)(5) increase where defendant drove 23 illegal aliens in van equipped to accommodate 14); United States v. Hernandez-Guardado, 228 F.3d 1017, 1027-28 (9th Cir. 2000) (holding that district court did

not abuse its discretion in imposing recklessness enhancement where defendant transported 18 passengers in van rated for 15).

As such, this case resembles United States v. Maldonado-Ramires, 384 F.3d 1228 (10th Cir. 2004), where we upheld a § 2L1.1(b)(5) enhancement. There, the defendant "transported the illegal aliens in a minivan altered to remove the rear seats and seatbelts, . . . was the only driver on a lengthy trip from Arizona to Florida, and . . . mandated that the passengers always remain prone on the floor of the van . . . ." Id. at 1231. Of course, Munoz ordered only two passengers to lie on the back floor of the Suburban – as opposed to the six occupants who were similarly situated in Maldonado-Ramires. See id. at 1229. Nevertheless, the concern was not the crowding of the occupants but the fact that they were deprived of any ability "to react to any dangerous driving conditions that might arise during the trip." Id. at 1231; see also Zuniga-Amezquita, 468 F.3d at 889 ("Transporting aliens in a manner that significantly hinders their ability to exit the vehicle quickly creates a substantial risk of death or serious bodily injury."). Thus, each of the factors present in Maldonado-Ramires is also present here.

The district considered the above-listed factors a "deadly combination" that Munoz "knew of and was instrumental in creating." We concur and, as such, both § 2L1.1(b)(5)'s commentary and our precedents convince us that we must uphold the enhancement of Munoz's offense level.

**B. Munoz's Challenge to the Court's Upward Departure**

Munoz advances two arguments at the district court's five-level upward departure. First, Munoz claims that <u>Booker</u> removed <u>Jose-Gonzalez</u>'s keystone and thereby stripped the relevant portions of that case of their precedential value. Second, Munoz argues that the district court ignored factors that it was required to consider before departing upward under U.S.S.G. § 5K2.1. We disagree with both arguments.

**1. Standard of Review**

Even after <u>Booker</u>, we review upward departures using a four-part test. We ask, in turn,

> (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable.

<u>Wolfe</u>, 435 F.3d at 1295 (quoting <u>United States v. Whiteskunk</u>, 162 F.3d 1244, 1249 (10th Cir. 1998)). Although we apply a "unitary abuse of discretion standard" to these four prongs, we have specified that the degree of deference to the district court varies depending on the "essential nature of the question presented [on appeal] . . . ." <u>Id.</u> (quoting <u>Whiteskunk</u>, 162 F.3d at 1249). That is, if the question on appeal has the hue of a factual question, we accord the

district court greater deference, whereas we undertake plenary review of questions that are in essence legal. Id.[22]

## 2. Merits

As a preface, U.S.S.G. § 5K2.0 empowers the sentencing court to depart where it has identified circumstances "<u>not adequately taken into consideration</u> by the Sentencing Commission" or where the offense conduct involved a circumstance "present . . . to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense." U.S.S.G. § 5K2.0(a)(1) & (a)(3) (emphasis added).

Section 5K2.1 enumerates one such ground for departure: "[i]f death resulted, the court may increase the sentence above the authorized guideline range." U.S.S.G. § 5K2.1. However, "[l]oss of life does not automatically suggest a sentence at or near the statutory maximum." Id. Rather, in deciding whether to depart upwards, the

> sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury.

---

[22]While we have yet to apply this framework after <u>Gall</u>, we are convinced it remains valid.

Id.

In Jose-Gonzalez, this court affirmed a district court's decision to depart upward, pursuant to U.S.S.G. §§ 5K2.1 – .2, because the applicable guideline for transportation of aliens, § 2L1.1, did not provide any enhancement where the offense conduct resulted in multiple deaths or injuries. Jose-Gonzalez, 291 F.3d at 701-03. Having acknowledged that § 2L1.1 does factor in death or bodily injury, in the singular,[23] this court continued on to hold that "multiple deaths and injuries" are valid "grounds for departure." Id. at 703 (emphasis added).[24]

Lastly, the Jose-Gonzalez court held that 18 U.S.C. § 3553(b) foreclosed the appellant's reliance on "Congressional hearings, debates, and even directives to the Commission as establishing what the Commission must have taken into account." Id. (underscoring that § 3553(b) barred sentencing courts from delving into evidence – other than "the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission" – to decide whether the Commission adequately accounted for a particular circumstance).

---

[23]Indeed, § 2L1.1(b)(6) mandates: "If any person died or sustained bodily injury, increase the offense level according to the seriousness of the injury . . . ." U.S.S.G. § 2L1.1(b)(6). It then provides for increases ranging from two levels (for "Bodily Injury") to eight levels (for "Death"). Id. We have read this to mean that § 2L1.1(b)(6) "makes no distinction between one death or 100." Jose-Gonzalez, 291 F.3d at 703.

[24]Along the way, the court also rejected the argument that § 2L1.1(b)(2) (which provides an increase for transporting multiple unlawful aliens) incorporated multiple deaths and injuries. Jose-Gonzalez, 291 F.3d at 702.

Here, the sentencing court looked to U.S.S.G. § 5K2.1 and the logic of Jose-Gonzalez to justify its decision to depart upwards.[25] We return now to our four-part test for determining whether the departure was permissible.

*a. Whether the factual circumstances supporting a departure are permissible departure factors*

Because this first issue "is essentially a legal one," we review it de novo. Jose-Gonzalez, 291 F.3d at 701. The district court invoked Jose-Gonzalez as authority to depart upwards in light of the multiple deaths and injuries inflicted by Munoz's accident. The issue is whether Booker's removal of § 3553(b)(1) enervates Jose-Gonzalez's holding regarding departure factors.

On appeal, Munoz adduces the same type of evidence – namely, indications that Congress and the Sentencing Commission considered this very issue – that the Jose-Gonzalez court rejected because of § 3553(b). However, because Booker excised § 3553(b)(1), see Booker, 543 U.S. at 259, Munoz contends the door is

---

[25]Although it omitted any explicit reference to U.S.S.G. § 5K2.2, the court likely considered this section as well. It provides:

> If significant physical injury resulted, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was intended or knowingly risked. When the victim suffers a major, permanent disability and when such injury was intentionally inflicted, a substantial departure may be appropriate. If the injury is less serious or if the defendant (though criminally negligent) did not knowingly create the risk of harm, a less substantial departure would be indicated. In general, the same considerations apply as in § 5K2.1.

U.S.S.G. § 5K2.2.

now open for him to introduce this evidence to show that U.S.S.G. § 5K2.0 disallows departure on these grounds.[26]

Munoz offers a snapshot of the congressional history driving the Sentencing Commission's treatment of alien transportation offenses. Specifically, Munoz highlights portions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 203, 110 Stat. 3009, wherein Congress instructed the Commission to "consider whether any other aggravating or mitigating circumstances warrant upward or downward sentencing adjustments." Id. at 3009-557. As Munoz notes, the Commission incorporated Congress's concerns into amendments to § 2L1.1, including the § 2L1.1(b)(5) reckless endangerment enhancement and the § 2L1.1(b)(6) enhancement for conduct resulting in death or serious bodily injury. See U.S.S.G. App. C, amend. 543.

In light of these amendments, Munoz concludes that the Commission "[p]resumably . . . complied with Congress' directive," full stop. According to Munoz, the Commission must have weighed, and in the end rejected, the possibility of recommending upward departure for multiple deaths. Munoz

---

[26]Booker, an intervening Supreme Court precedent, empowers us to reconsider certain aspects of Jose-Gonzalez. Cf. United States v. Torres-Duenas, 461 F.3d 1178, 1183 (10th Cir. 2006) ("[A]bsent en banc review or intervening Supreme Court precedent, we cannot overturn another panel's decision." (emphasis added)).

augments this argument by offering the Commission's publication (for public comment) of a proposed adjustment that would account for multiple deaths, see 69 Fed. Reg. 2169, 2171 (Jan. 14, 2004); as Munoz notes, the Commission never adopted the proposed adjustment.

Far from helping him, the Commission's proposal undercuts Munoz's claim. Not only does the proposal reveal that the Commission believed that its guidelines do not adequately take into account the multiple deaths circumstance, the proposal also propounds the very same procedure for taking multiple deaths into account that the district court followed in this case. Indeed, the proposed amendment to § 2L1.1 would have added a "[s]pecial [i]nstruction" mandating that "[i]f the offense involved the death of more than one alien, Chapter Three, Part D (Multiple Counts) shall be applied as if the death of each alien had been contained in a separate count of conviction." Id. By invoking § 3D1.1 et seq., the Commission's proposal tracks the procedure affirmed by this court in Jose-Gonzalez and followed by the district court in this case.

Munoz is correct that the Commission considered the procedure explained in Jose-Gonzalez and has yet to adopt the approach formally. This does not mean, however, that the Commission thought the Guidelines, as currently constituted, cover the issue. "[T]he Commission's awareness" of this topic "does not compel the conclusion that the Guidelines address the issue of multiple deaths or injuries" adequately. Jose-Gonzalez, 291 F.3d at 703. Rather, as this court has

- 28 -

noted, the Commission occasionally opts to "await developments in the sentencing courts" before officially sanctioning an enhancement by placing it in the guidelines. Id. at 703 (citing U.S.S.G. ch. 1, pt. A, intro. comment 4(b)).

Even though Booker opened the door to evidence regarding the Sentencing Commission's consideration of this issue, we are convinced that Jose-Gonzalez remains good law. Thus, the district court did not err in deciding that the multiple deaths and injuries precipitated by Munoz's accident were permissible departure factors.

> *b. Whether the departure factors relied upon by the district court remove the defendant from the applicable guidelines heartland thus warranting departure*

This second prong commingles factual and legal questions. In Jose-Gonzalez, we clarified that "the determination of the heartland is a legal matter to the extent that it relies on interpretation of Guidelines language but a factual matter to the extent it relies on experience with the type of offense involved." Jose-Gonzalez, 291 F.3d at 704. Having laid out this distinction, the Jose-Gonzalez court concluded that the issue there – whether the number of deaths and injuries resulting from the offender's transportation of aliens warranted a departure – was "one on which we should defer to the district court." Id. As this case is on all fours with Jose-Gonzalez, we apply the abuse of discretion standard.

While U.S.S.G. § 2L1.1(b)(6) takes into account the fact that a person died, here, four of Munoz's passengers perished. The accident left another passenger

without a leg, caused another passenger serious head trauma, and put another passenger in a coma. In light of this tragic toll, we hold that the district court did not abuse its discretion in deciding that Munoz's case was outside the bounds of the "typical cases embodying the conduct that [the] guideline describes." U.S.S.G. ch. 1, pt. A, intro. cmt. 4(b).

*c. Whether the record sufficiently supports the factual basis underlying the departure*

Typically, we review this issue for clear error. Jose-Gonzalez, 291 F.3d at 704. Munoz, however, does not dispute the district court's findings regarding the deaths and injuries that resulted from the accident.

*d. Whether the degree of departure is reasonable*

Our "review of the degree of the district court's departure is 'deferential,'" Wolfe, 435 F.3d at 1303 (quoting Whiteskunk, 162 F.3d at 1253); see also United States v. Smart, 518 F.3d 800, 807 (10th Cir. 2008) (noting that Gall forbids application of "heightened standard of review to sentences outside the Guidelines range"). As such, we curtail our consideration, looking only at

> the district court's proffered justifications [for the departure], as well as such factors as: the seriousness of the offense, the need for just punishment, deterrence, protection of the public, correctional treatment, the sentencing pattern of the Guidelines, and the need to avoid unwarranted sentencing disparities.

Wolfe, 435 F.3d at 1303 (quoting United States v. Martinez, 418 F.3d 1130, 1133 (10th Cir. 2005)). In justifying its departure, the sentencing court must articulate

both factual bases for the departure <u>and</u> its "reasons for the <u>degree</u> of departure." <u>Jose-Gonzalez</u>, 291 F.3d at 705. While "we do not require the district court to justify the degree of departure with mathematical exactitude, . . . we do require the justification to include some method of analogy, extrapolation or reference to the sentencing guidelines." <u>Wolfe</u>, 435 F.3d at 1305 (quoting <u>Whiteskunk</u>, 162 F.3d at 1254).

Here, the sentencing court "[a]nalogiz[ed] to other guidelines," thereby employing a "primary method by which district courts may justify the reasonableness of their departure." <u>United States v. Neal</u>, 249 F.3d 1251, 1258 (10th Cir. 2001). Indeed, the court, by adopting the <u>Jose-Gonzalez</u> methodology, extrapolated from U.S.S.G § 3D1.4. Additionally, the court explained its decision to employ this methodology by noting that the Commission's justification for the grouping rules "is that all such offenses share the same single victim – the societal interest in controlling immigration." <u>Jose-Gonzalez</u>, 291 F.3d at 707. However, "[w]hen . . . the gist of the offense is injury to persons, the offense against each human victim belongs in a different group." <u>Id.</u> Therefore, the upward departure was warranted because of the court's concern for human safety and the sanctity of life. Because the pertinent portion of <u>Jose-Gonzalez</u> remains valid, we cannot find fault with either the district court's rationale for the departure or the degree of that departure.

Lastly, Munoz challenges one additional aspect of the court's process. He claims that the court, while relying on § 5K2.1, neglected to discuss on the record the factors delineated in that section. The district court did not expressly address "the defendant's state of mind and the degree of planning or preparation," U.S.S.G. § 5K2.1, but the district court did expound on another "appropriate factor[]," id. Specifically, the district court discussed the fact that "multiple deaths resulted" in detail. Id. In the Fourth Circuit case that Munoz relies on, the sentencing court had provided no guidance as to its rationale for departing upward pursuant to § 5K2.1 and had "failed to consider any of the aforementioned factors." See United States v. Terry, 142 F.3d 702, 709 (4th Cir. 1998) (emphasis added). Thus, Terry is distinguishable and Munoz's final argument is unavailing.

## III.  CONCLUSION

As discussed above, the sentencing court correctly calculated his advisory guidelines sentence, and hitched its upward departure to a method ratified by Jose-Gonzalez. The court then scrutinized that amended range in light of the § 3553(a) factors. The court's care in crafting this particular sentence is evident. With the minor exception noted above, we concur with the court's rationale and result. As such, we **AFFIRM** Munoz's sentence.